**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BRICE MUSGROVE, and as next of kin for,** | * | |
| **M.M. B.M., S.M., P.M.,** | * | |
| **v.** | * | |
| | * | |
| **SANDRA JACKSON, (PRESIDING 302ND** | * | **Civ. No.** |
| **JUDICIAL DISTRICT)** | * | |
| **(official and individual capacity)** | * | |
| **SANDRA STREETE (official capacity)** | * | |
| **JOHN WILEY PRICE, individual and** | * | |
| **official capacity** | * | |
| **MICHELLE O'NEIL** | * | |
| **BRIAN ANDRADE** | * | |

# ORIGINAL COMPLAINT AT LAW

Daniel A. Dailey
*Chief Federal Litigation Counsel*
KINGDOM LITIGATORS
INTERNATIONAL LTD.
500 N Michigan Ste. 536
Chicago, IL 60611
Phone: (312) 999-8331
Email: ddailey@kglit.com
*Admitted in NDTX*

NOW INTO COURT Comes, Brice Musgrove, and as next of kin, for minors, M.M., B.M., S.M., P.M., PLAINTIFFS, by and through their attorneys KINGDOM LITIGATORS, INTERNATIONAL, LTD., filing this action against DEFENDANT (s) SANDRA JACKSON, in her official and individual capacity, JOHN WILEY PRICE, officially and individually, SANDRA STREETE, officially and individually, MICHELLE O'NEIL, individually, and BRIAN ANDRADE, individually, pursuant to 42 USC § 1983, 1985, *inter alia,* violation of the First, Fifth, and Fourteenth Amendments.

# INTRODUCTION

The "[U.S. Supreme Court] has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection.[1] (*see generally* Exhibit 1) ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[2] The Court has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed. Thus, the 'liberty' of parents to control the education of their children that was vindicated in *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), was described as a 'right, coupled with the high duty, to recognize and prepare [the child] for additional obligations.' *Id.,* at 535. The linkage between parental duty and parental right was stressed again in *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), when the Court declared it a cardinal principle 'that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Ibid.*

As a nation, the U.S. Supreme Court reminded us that LOVE trumps ALL, and LOVE in the best interest of the children should be the bases in terminating or limiting the rights in any parental dispute—*not revenge politics or slavery legal devices*. Plaintiffs, specifically, the Musgrove Children ***are suffering severe mental, spiritual, and physical anguish*** from the entrenched slave destabilization patterns and practices in the Dallas County Family Courts. These tactics escalated, in their case, for political reasons causing more harm to the Musgrove Children

---

[1] *See generally* Exhibit 1 (Uniquely Common: The Cruel Heritage of Separating Families of Color in the United States; Rachel Johson Farias; Harvard Law and Policy review, (2020).
[2] *Troxel v. Granville,* 530 U.S. 57, 66 (2000).

than the politicians. Today, the Musgrove Children are counting on their Daddy to fight for their future emotional, spiritual, and physical stability—in their best interest—not politics.

Plaintiffs engaged in protected speech, but Defendants retaliated by *perpetually interfering* in the family court proceedings such that the Musgrove Children are denied access to their father. These destabilization practices of the Dallas County Family Courts are destroying the spirit of the law of LOVE long recognized as a constitutional right under the Fifth and Fourteenth Amendment. Federal intervention is the only way to end the judicial standoff below.

## SANDRA JACKSON TAKES POLITICAL REVENGE IN DALLAS FAMILY COURT.

Plaintiff, Brice Musgrove, is a respected military graduate of the Naval Academy, dedicated father, and pillar in his community. The Musgrove Children have not physically seen their father since October 5, 2025. Plaintiff Musgrove was never accused of abuse or endangerment of any kind. The marriage dissolved after the mother, Sadarria Musgrove, stepped out of the marriage with an enlisted sailor while she was an officer, and the marriage never recovered. The major dispute in the divorce was geographical restrictions for the children to remain as a family unit in Dallas County.

Yet, underneath the surface the real dispute in Dallas County became a political and gender war, which has now paralyzed the Dallas County family courts. One of its own judges, Defendant Jackson, under color of law, systemically destabilizes families with ruthless brutality, desire and a smile. Defendant Jackson has *perpetually interfered* with Plaintiff's rights to the extent, as Defendant J.W. Price stated, "nobody [judge] wants to touch the case" to enforce post-trial relief reuniting the Musgrove Children with their father. This is destabilizing the Musgrove Children's future mental, emotional, and spiritual health, and its intentional.

Plaintiff politically spoke against Defendant Jackson's relentless determination to inflict psychological, emotional, spiritual, physical, and financial torture over families particularly, men, and disproportionately African American men. Defendant Jackson's retaliation against Plaintiff continued to escalate, and Defendant Jackson used her judicial power to force recusals of nearly every single judge in Dallas County, even the regional judge has recused himself. There is no end in sight, and the Musgrove Children were ***already*** court ordered to be returned, but judicial politics are preventing a hearing and now require federal judicial intervention.

So many families have suffered agonizing mental health breakdowns, because of Defendant Jackson's destabilization and separation tactics from their children. She openly brags on needing security due to the number of men she sends to jail, or according to John Wiley, her "clearance rate." Defendant Jackson and Price's *perpetual interferences* intentionally destabilize good families.

Plaintiffs unfortunate case is one of latest travesties. As of the filing of this lawsuit, the Plaintiffs' Musgrove Children have not seen their father in nearly a year. Although another Dallas County Judge, who immediately reviewed the case ordered the Musgrove Children be returned to Dallas County, the mother refused, and a procession of recusals ensued.

Political and judicial *perpetual interferences* have delayed all proceedings, because no judge will hear the enforcement and every judge continues to recuse themselves based on a conflict which Defendant Jackson engineered. The conflict fueling the judicial politics has divided judges supporting Defendant Jackson a Democrat, and Plaintiffs' Conservative Republican family. Plaintiffs have a protected right to politically oppose the Dallas County family judges who continue to destabilize families, and particularly black families using court tactics rooted in perpetuating slavery justice in Texas.

Plaintiffs' position is confirmed, indeed, Defendant Price, the Dallas County Commissioner who oversees the court clerk's budget, stated there has been a concerted effort to "*perpetually interfere*" with the Plaintiffs' cases.

In private political communication to Defendant Price:

> **Plaintiffs' family states**: Sandre Streete "doing the work" like other Dallas county family judge you endorse she too is continuing to use her bench to alienate black children from their fathers.
>
> **Defendant Price responded**: "It's because of *perpetual interference* that nobody is touching the case and the Administrative Judge is probably going to appoint a Republican from the hither lands. BTW, she lost."
> (emphasis added).

However, Plaintiffs learned Defendant Price himself *was* the *perpetual interference.* Defendants Jackson's court tactics included, Defendant Price using his role as Dallas County Commissioner to "go into courtrooms," and pass messages or influence outcomes in family and criminal courts to keep the jail facilities full. Through a system of grooming judges through mentorship and social visits, Defendant Price inserted himself in the Plaintiffs' case in support of Defendant Jackson's political retaliation against Plaintiffs. Plaintiffs Brice and the Musgrove children are seeking, *inter alia,* to enjoin Defendants from further *perpetual interference* in retaliation for exercising their First Amendment Rights.

Dallas County Family Courts are violating the spirit of the law which incorporates parental Love as a fundamental right in the U.S. Constitution. Federal intervention is critical.

## PARTIES

1. Plaintiff, Brice Musgrove is a highly respected African American military veteran. He is a proud graduate and officer of the United States Naval Academy, and he bravely served three tours of duty in loyal service to this country.

2. Plaintiff Brice Musgrove, as next of kin, is a loving father of three girls and one son, ages 6, 4, 4, 2 (next of kin for M.M., B.M., S.M., P.M,) hereinafter the "Musgrove Children."

Plaintiff is a high school football coach as well as mentor to young men at his family church. Plaintiff is citizen of the United States and resident of Dallas County. Due to mutual family differences, Plaintiff found himself in Defendant Jackson's court seeking dissolution of marriage, but not destabilization of his entire family.

3. Defendant Sandra Jackson, in her official capacity is an elected judicial officer of the State of Texas. In Defendant Jackon's individual capacity, and upon information and belief, Defendant Jackson resides in Dallas County. Defendant Jackson is not entitled to judicial immunity because, *inter alia,* she stepped out of the role of a judicial officer, created conflict with Plaintiff while on her political campaign tour, engaged in communications with Defendant Price, and organized sophisticated whisper campaigns to "*perpetually interfere*" with the safe return of Plaintiff's four children. Accordingly, Defendant Jackson acted in her individual capacity for political reasons and used her judicial authority to take adverse actions against Plaintiff.

4. Defendant John Wiley Price, in his official capacity, is an elected commissioner of Dallas County.

5. Defendant Michelle O'Neil is a Texas based family lawyer and upon information and belief resides in Dallas County. Defendant O'Neil boasts of her influence over family court judges and political allies such as Defendant Price. One family Court judge has a standing recusal order against Defendant O'Neil due to her *perpetual interference,* "influence" on Dallas family court judges, and candor to the court.

6. Defendant Brian Andrade is a local family law attorney that regularly appears before Defendant Jackson. Defendant Andrade resides in Dallas County upon information and belief. Defendant Andrade fraudulently hired Defendant O'Neil for her strategic ability to

interfere in the legal proceedings causing delays and denial of access to courts using, and in close connection with Defendant Jackson, based on information and belief.

## JURISDICTION

7. This Court has jurisdiction pursuant to 28 USC §1331, First Amendment, Fifth Amendment, and Fourteenth Amendment.

## VENUE

8. Venue is proper in Dallas pursuant to 28 USC §1391 because all parties reside in Dallas County, and the facts which gave rise to the underlying cause of action occurring in the Northern District of Texas.

## FACTS

### I. Overview of the Underlying Proceedings.

9. During the underlying divorce proceedings before Defendant Jackson, there were allegations of adultery, fraud and waste. As it relates to adultery, mother, Sadarria Musgrove admitted to an affair with an enlisted navy sailor while she was an officer.

10. As it relates to fraud, Sadarria Musgrove admitted to claiming her brother on her federal and state income taxes as residing with her during the marriage, when, in fact, he did not.

11. There were no allegations of fraud against Plaintiff Brice Musgrove, but Plaintiff did admit to stepping out of the marriage in retaliation to the mother, Sadarria Musgrove's infidelity.

12. The underlying proceedings were very contested along political and gender battlelines throughout the Dallas Family Courthouse, even the court clerks and coordinators took political and genders sides.

13. Defendant Jackson signed the Final Divorce Order and restricted the mother and the Musgrove Children to Dallas County, *and* ***Greenville County, South Carolina.***

14. Appeals and motions followed the trial, and ultimately the mother was ordered by Dallas County District Court 255th to return to Dallas County by December 21, 2025.

15. District Court 255th directly disagreed with Defendant Jackson's ruling to allow the mother to leave, so the judicial political fired escalated to conflict(s) with all judges taking positions to recuse, as intended by all Defendants.

16. As of today, the mother has not returned, and no Dallas Court will hear the enforcement proceedings due to the ongoing internal judicial conflict. Even visiting judges refuse to accept the case after learning of judicial politics now at its boiling point.[4]

a. DEFENDANT JACKSON STAGED A PUBLIC 'CHURCH SPECTACLE' TO CREATE A "CONFLICT OF INTEREST."

17. The political retaliation and dispute began early in the divorce proceedings and was documented, but the escalation occurred outside of the courtroom, at Plaintiffs' church on Sunday, November 9, 2025.

18. Defendant Jackson always knew of Plaintiffs' opposing political views as a black conservative republican. Defendant Jackson knew of Plaintiffs' church and strong family and community ties, support her opposition to winning the 302nd district court seat.

19. On or about December 18, 2024, CW2 Pastor appeared in support of Plaintiffs, in

[4] As of September 4, 2026, Judge Wheless said in an email, a visiting judge agreed to hear Plaintiff Bill of Review but he did not want the assignment to the family law case itself. Thus, no judge still will hear the enforcement to reunite the children with their father. (*See also* Ex_2).

Defendant Jackson's court; Defendant Jackson publicly recognized the Pastor from the bench and knew he was in support of Plaintiffs' family unit stabilization in Dallas County.

20. On or about, October 9, 2025, CW 2 Pastor came to observe proceedings, again, and Defendant Jackson saw and acknowledged him.

21. Defendant Jackson later requested political support from CW 2 pastor, but CW 2 stated he would not vote for her, due to what he observed in court.

22. Plaintiff alleged throughout the underlying proceeding that Defendant Jackson had an implicit bias and the Dallas community began observing and noting Defendant Jackson's patterns publicly. Many considered Dallas residents began attending the court proceedings, and Defendant Jackson would question Plaintiffs' local family attorney about their presence in open court.

23. CW 3, Plaintiffs' family pastor, was also approached to politically support Defendant Jackson after attending the proceedings, CW 3 told Defendant Jackson based on her conduct, he would not be politically supporting her.

24. On October 14, 2025, Plaintiff openly attended Defendant Jackson's opponent campaign fundraiser, as political speech in support of Desiree Bedasa. Defendant Jackson again learned of Plaintiffs political support for her opponent.

25. On Sunday morning, November 9, 2025, Defendant Jackson appeared at Plaintiffs' family church pastored by CW 2, under the auspice of a political function and campaign as Defendant Jackson's opponent planned to attend.

26. Defendant Jackson, as well as the other candidates are routinely told, and reminded before the event to stay in the lobby, however, Defendant Jackson defiantly campaigned in the sanctuary, prompting countercampaigns.

27. Here, Defendant Jackson observed, as Plaintiffs' family supported Defendant Jackson's opponent, who was also in the church in the lobby, and later in the sanctuary Plaintiffs' family openly supported Defendant Jackson's opponent.

28. The following day Defendant Jackson filed a voluntary recusal citing "conflict of interests."

29. After Defendant Jackson's voluntary recusal, seeking any post-relief judgment seemed to be in Plaintiffs' favor, except Defendant Jackson knew and intended to ignite an internal judicial war of gender and racial politics with such *perpetual interferences* that no judge will hear the enforcement proceedings for the mother to return the Musgrove Children to Dallas County.

b. DEFENDANT JACKSON RETALIATES WITH "PERPETUAL INTERFERENCES" WHICH DESTABILIZED, SEPARATED, AND ALIENATED PLAINTIFFS' FAMILY UNIT.

30. Defendant Jackson created *perpetual* 'conflicts of interests' with judges as political revenge to destabilize plaintiffs' family unit. To date, the Dallas County judges, including the regional judge continue to recuse themselves. This is due to the magnitude of Defendant Jackson's 'conflict of interest' with Plaintiffs' political speech.

31. The state of Texas is divided into eleven administrative judicial regions. The office of the First Administrative Judicial Region (1st AJR) is located in McKinney, Texas. The 1st AJR was created by the legislature in 1927 and currently covers 7 counties (listed below). Judge Ray Wheless was appointed by the Governor in 2018.

32. The duties of the presiding judge include promulgating and implementing regional rules of administration, advising local judges on judicial management, recommending changes to the Supreme Court for the improvement of judicial administration, and acting for local administrative judges in their absence.

33. The presiding judges also have the authority to assign visiting judges to hold court when necessary to dispose of accumulated business in the region.

> **Sec. 24.002. ASSIGNMENT OF JUDGE OR TRANSFER OF CASE ON RECUSAL. If a district judge determines on the judge's own motion that the judge should not sit in a case pending in the judge's court because the judge is disqualified or otherwise should recuse himself or herself, the judge shall enter a recusal order, request the presiding judge of that administrative judicial region to assign another judge to sit, and take no further action in the case except for good cause stated in the order in which the action is taken. A change of venue is not necessary because of the disqualification of a district judge in a case or proceeding pending in the judge's court.**

c. *The* PROCESSION OF JUDICIAL RECUSALS.

1. *In the Child Custody Dispute cause DF-23-16486*

34. On or about, October 9, 2025, hearing on Petitioner's Motion for New Trial took place in the 302nd Judicial District Court, Dallas County, Judge Sandra Jackson, presiding.

35. On or about, October 14, 2025, Plaintiffs attended, and publicly supported the campaign of Desiree Bedasa for District 302.

36. On or about, Sunday, November 9, 2025, Defendant Jackson executes staged political stunt at the Plaintiff's Church.

37. On or about, November 10, 2025, Judge Sandra Jackson recused herself on the basis of a "conflict of interest" under cause DF-23-16486 the ("hereinafter the custody dispute").

38. On or about, November 11, 2025, the custody dispute was transferred to the 255th Judicial District Court, Dallas County, Judge Vonda Bailey, presiding.

39. Hon. Judge Bailey has standing recusal against Defendant Michele O'Neil issued on June 25, 2025.

40. On or about, December 11th, 2025, Hon. Judge Jean Lee, the Associate Judge for the 255th Judicial District Court, heard the custody dispute pending appeal.

41. After receiving several hours of testimony, on December 12, 2025, Hon. Judge Lee granted father-petitioner requested relief to have mother return his children to Dallas County pending the outcome of the appeal by December 21, 2025.

42. On or about, December 17, 2025, Michelle O'Neil filed Notice of Appearance in custody dispute action before Hon. Judge Bailey.

43. On December 19, 2025, two days before the children were supposed to return, Defendant O'Neil sent a letter of recusal to Hon. Judge Bailey.

44. Mother refused to return on or before December 21, 2025, and the father Brice Musgrove, filed an enforcement motion on February 4, 2026.

45. On or about, January 5, 2026, Father-Petitioner filed Petitioner's Objection to Recusal and Transfer. Despite requesting a hearing, no hearing or ruling was ever provided on Father-Petitioner's Objection.

46. On February 4, 2026, the motion for enforcement and hearing for return of the Musgrove Children was filed before Hon. Judge Bailey, and hearing set for April 28, 2026.

47. On February 18, 2026, Hon. Judge Bailey recuses herself, per her standing order in the custody dispute action.

48. On or about, February 18, 2026, transferred to Judge Sandre Streete.

49. On April 27, 2026, the day before the enforcement hearing, Defendant Streete recuses herself due to her relationship with Defendant Jackson after information and belief.

50. Defendant Sandra Streete and Jackson share a close relationship politically, professionally, and personally. Although Defendant Streete knew immediately of her 'conflict of interest' but she held the case on her docket for two months, and the day before the enforcement

hearing decided to recuse herself, in agreement, with Defendant Jackson's *perpetually interference* in Plaintiffs' Custody Dispute and Bill of Review.

51. On or about, April 29, 2026 - Michelle O'Neil filed Motion to Withdraw from the custody dispute action.

52. On or about, April 30, 2026, Judge Ray Wheless grants Michelle O'Neil's Motion to Withdraw in the custody dispute action by no objection of the parties.

53. On or about, April 30, 2026, the custody dispute action, (and pending enforcement) was transferred back to Judge Vonda Bailey.

54. On or about, May 5, 2026, Michelle O'Neil filed Motion to Vacate Withdrawal claiming the Motion to Withdraw bearing her signature was "inadvertently tendered" in the custody dispute action.

55. On or about, June 5, 2026, Michelle O'Neil filed Motion to Recuse Judge Vonda Bailey again in the custody dispute action.

56. On or about, July 6, 2026, Michele files an "official" notice of appearance in the custody dispute.

57. On or about, July 8, 2026, Texas Supreme Court says that Hon. Judge Wheeless is recused from hearing the motion to vacate order granting Defendant Michelle O'Neil withdrawal. Hon. Judge Wheeless recused due to Defendant Jackson and Defendants continued *perpetual interference*, after information and belief. Judge Bailey refused to sign the order recusing herself, due to Defendants O'Neil and Andrade's fraudulent conduct upon Judge Bailey's court.

58. On or about, July 9, 2026, the parties were notified by Judge Wheless that Judge Bailey recused herself.

59. However, Hon. Judge Bailey refused to recuse herself. After information and belief, Judge Bailey has not recused herself because she believes Defendants Michelle O'Neil and Brian Andrade are forum shopping and violating Plaintiff's due process rights by causing further delays in the proceedings.

60. The Hon. Judge Bailey, in the interest of justice, declined to sign a recusal order, due to Defendants' *perpetual interference*s, based on continued information and belief.

61. Plaintiffs' local family attorneys have sent multiple requests to the regional judge, and Judge Bailey for official recusal notices and a transfer, but the political divide has prevented any responses.

62. The case is just sitting, and Plaintiffs' attorneys are pleading for a judge to hear the enforcement without recusing themselves.

*ii. Procession of Recusals in Bill of Review under cause no DF-26-00524.*

63. On or about, on January 15, 2026, Father-petitioner filed the bill of review for the "alleged conflict of interest that biased the proceedings" before Hon. Judge Bailey under cause no DF-26-00524 (hereinafter, "Bill of Review)."

64. On or about, April 30, 2026, mother was ordered for an in-person hearing in Dallas County.

65. On or about, May 13, 2026, Defendant O'Neil filed a notice of appearance.

66. On or about May 18, 2025, Defendant O'Neil sent letter to the Dallas County clerk for Judge Bailey to recuse herself.

67. On or about June 16, 2026, Hon. Judge Bailey recuses herself.

68. On or about July 2, 2026, the case was transferred to Judge Kim Brown, and the mother was set to be deposed by July 6, 2026 but failed to appear.

69. On or about July 31, 2026, and August 3, 2026, Father Petitioner filed discovery motions and requested hearing dates before Hon. Judge Kim Brown.

70. On or about August 4, 2026, Hon Judge Kim Brown never responds, but recuses herself, due to her relationship with Defendant Jackson and Defendants continuing *perpetual interference*, based in information and belief.

71. On or about August 5, 2026, the Bill of Review is transferred to Hon. Judge Ledeitra Adkins.

72. On August 10, 2026, Hon. Judge Ledeitra Adkins recused herself, due to her relationship with Defendant Jackson and Defendants continuing *perpetual interference*, based on information and belief.

73. As of today, Defendant Price was correct, no Dallas County judge will hear or touch Plaintiffs' matter due to *"perpetual interference."*

d. DEFENDANT JACKSON HAS A PATTERN OF CREATING "CONFLICTS" TO DESTABILIZE CHILDREN FROM THEIR FATHERS.

74. Defendant Jackson actively enjoys inflicting slavery justice on men, and particularly African American men using the Dallas family courts contempt provisions.

75. Identical to tactics used in slave courts, in Defendant Jackson's court men are regularly berated, disrespected, and falsely accused without evidence. After information and belief, Defendants Jackson and Price *perpetually interfere* with cases to trade the men like chattel ensuring a steady supply to the Dallas county jails.

76. In fact, on one occasion an African American man entered her courtroom for the very first time and was resting his hands on his hips when Defendant Jackson screamed, "get your hands off your hips." At the conclusion of the brief matter, as he walked out the door,

Jackson screamed unsolicited from the bench, "I will issue a warrant you." The man remained silent and refused to give Defendant Jackson the reaction she sought.

77. On another occasion, Defendant Jackson called a sheriff because an African American lawyer placed his hand on the desk too hard while turning the page on his notes.

78. Identical to slave courts, Defendant Jackson attempts to intimidate and psychologically inflict emotional distress by refusing men the opportunity to speak, present evidence, or even seek relief from legitimate dangers to children, viewing the men as no more than chattel to produce financial gain for the State of Texas.

79. Defendant Jackson provokes men, and particularly African American men, to become so emotionally and psychologically destabilized they react irrationally, commit suicide, or turn to drugs to cope. This justifies her actions later to *duly convict* them as slaves.

80. Defendant Jackson openly brags in court, in political forums, and in hallways she needs security, because "[she] I don't play," she remarks, because she takes great pleasure in ripping families apart and putting distressed family members in jail.

81. Her courtroom deputy has been overheard stating, Defendant Jackson enjoys watching men struggle to explain family and financial crisis that demonstrate their diligence as a father first, while Defendant Jackson searches for ways to incarcerate the men with jail and gives 5–10-year probation sentences which are more onerous than felony criminal convictions.

82. Defendant Jackson enjoys ordering men to report monthly to a "court coordinator" (called, a "probation officer"). Every single month in addition to child support, the men are required to pay probation fees, which can vary based on the court coordinator or Defendant Jackson's particular desires precipitating that hearing.

83. Defendant Jackson chooses the probation fees based on hidden metrics. There is no universal number to determine these costs, and many times the men do discover they must probation fees until the meet with the "court coordinator" called a probation officer for the first time.

84. The "court coordinators" gather information against the men and use the information gained as currency throughout the courthouse to curry favors. Information may be reported back to the opposing counsel, clerks, and ultimately Defendant Jackson through a sophisticated whisper campaign.

85. Defendant J.W. Price has direct and devasting control over the Dallas courts staffing budget, placing at honest judges at his mercy to meet "clearance rates."

86. Using sophisticated whisper campaigns through clerks, and court coordinators monitored by Defendant Price, Defendant Price and Jackson *perpetually* interferes with cases through delay, scheduling, and recusals until the men, are spiritually, mentally, emotionally, and financially unable to fight for themselves or their children.

87. Defendant Jackson knowingly, and intentionally, separates men from their families causing extreme harm to children.

88. After separation from their fathers, children have suffered sexual abuse, molestation, and emotional and psychological terror caused by, and from Defendant Jackson's tyranny. CW 5's daughters were taken and he was separated from them because of the court delays, and costs of attorneys he lost hope in fighting for their return. Months later, the daughters were sexually molested by the mother's boyfriend and subsequently returned to the father. The mother's boyfriend was convicted and sentenced to ten years in prison, however, the damage from the father's absence and protection was already done.

89. CW6 had four children and fought in Defendant Jackson's court but she intentionally drafted an order that he was not permitted to present any evidence. Defendant Jackson silenced the father anytime he attempted to present evidence regarding the safety and welfare of the children. CW 6's son was molested at the mother's home; all the children had to be removed. The CW 6's son now struggles with his sexuality.

90. Dallas County Family Courts delay and abusive legal tactics, knowingly and intentionally cause separation, destabilization, and alienation inflicted upon men, and disproportionately men of color.

91. Plaintiffs' Underlying Case. Plaintiffs' family attorney objected and attempted to present evidence, however, Defendant Jackson refused to follow her own procedures. For example, the father and mother were permitted to an hour and a half to present their case. Father went first, and reserved time for rebuttal. Mother went next and raised issues of fact. With 27 minutes reserved for the father, Defendant Jackson shocked the courtroom stating she did not want to receive any more evidence from father.

i. Defendant Jackson forced the father, who was ordered to pay 100% of his income to the mother during the pendency of the divorce, to now pay 50% of his income, all the back mortgage, and monthly mortgage, leaving father with -$537.10 per month, and awarding a surplus after bills to the mother of $3,370.00.

ii. Defendant Jackson claimed because father missed four agreed visitations that the father was not in their best interests and allowed the children to go over one thousand miles away to South Carolina.

iii. Father was prohibited from presenting any further evidence with his remaining 27 minutes.

92. CW 4's Underlying Case. Father's attorney was prevented from showing evidence that the Texas Attorney General's office had not created a child support file, but the father paid anyway via Venmo. Nevertheless, Defendant Jackson put the man in jail for thirty days. The

father's attorney was stunned silent. After seven days, the father was brought back before Defendant Jackson, and it was discovered the Texas Attorney General did not have the file. Defendant Jackson refused to correct the injustice.

93. Each and every witness is afraid Defendant Jackson will exact revenge using the family court if they publicly disagree. Defendant Jacksons influence through Defendant Price's whisper network is sophisticated, and the cause of the delay of both family and criminal proceedings throughout all of Dallas County.

94. Defendants Adrade, Streete, and O'neil knew of Defendant Jackson's patterns and practices and conspired to ensure that each judge recused themselves based on Defendant Jackson's "conflict of interest" for political and gender reasons.

e. DEFENDANT JACKSON'S AND PRICE'S SPECIAL RELATIONSHIP.

95. According to CW 1, has direct knowledge and confirmation of Defendant Jackson and Price's special relationship, in that, Defendant Price informs Jackson of community politics against her, Defendant Price protects Defendant Jackson politically, and Defendant Jackson allows Defendant Price to "enter her courtroom."

1. DEFENDANT PRICE INFORMS DEFENDANT JACKSON OF THE COMMUNITY POLITICS AGAINST HER.

96. On or about, May 22, 2025, men from the community and local churches planned and attended the proceedings before Defendant Jackson to politically protest her behavior.

97. Based in information and belief, Defendant Price called Defendant Jackson and informed her of the men's participation.

Defendant Jackson received prior notice to curb any words to avoid scrutiny by the community and public by Defendant Price.

### 2. DEFENDANT JACKSON ALLOWS DEFENDANT PRICE "INTO HER COURTROOM."

98. By "go into her courtroom," Defendant Price refers to influencing Defendant Jackson's decisions in matters Defendant Price has a personal or political interest in, and of course to ensure that the jails, and juvenile beds are filled.[5]

99. Defendant Price groom's judges for complying with his demands under the auspices of "political mentorship."

100. Defendant Price begins by courting the judge politically, then making romantic advances until they acquiesce. He later boasts to constituents, and his political base of this judicial influence as a posse, also known as "trophy judges."

101. Defendant Price *perpetually* interferes with criminal and family law cases throughout Dallas County. However, he is only allowed in courtrooms in which the judge has been "groomed" politically and personally.

102. Take Judge Vonda Bailey for example who courageously spoke out against Defendant Price. She soon suffered from a calculated smear campaign organized and managed by Defendant Price because she refused his romantic advances, upon information and belief.[6]

103. Defendant Price falsely claimed Judge Bailey had a low clearance rate and defamed her through the entire city of Dallas using courtroom coordinators, clerks, and other politicians to fuel a whisper campaign.

---

[5] https://www.dallasnews.com/news/politics/2023/04/04/dallas-county-force-price-out-of-20-year-seat-on-juvenile-board-following-public-spat/

[6] https://www.dallasnews.com/news/politics/2026/01/23/district-court-judge-sues-dallas-county-commissioner-john-wiley-price-for-defamation/.

104. In fact, Judge Bailey did not have a low clearance rate, she refused to be Defendant Price's "trophy judge," and would not join the political games with Defendant Jackson and Defendant Price.[7]

105. Upon information and belief, it was Defendant Jackson who orchestrated contact with Defendant Michelle O'Neil and Defendant Brian Andrade who requested that she file an appearance in Plaintiff's underlying family matter so that Judge Bailey would be forced to recuse herself, per her standing court order against Defendant O'Neil.

106. Defendant Price had a personal and political interest to support Defendant Jackson, so he could "enter her court." This information came to light only during the democratic election primaries.

107. During a politically protected speech, when confronted by Plaintiff's family law attorney Defendant Price specifically confirmed in a private message that *perpetual interference* is keeping every Dallas county family judge in paralysis from touching Plaintiff, Brice Musgrove's case.

### 3. DEFENDANT PRICE CONFIRMS DEFENDANT JACKSON AND STREETE ARE AMONG "*PERPETUAL INTERFERENCES*" IN PLAINTIFFS' CASE.

108. Defendant Price has openly admitted that the Dallas Courts are slavery but because he oversees the court budget and Dallas County jail, Defendant Price ensures that the beds, jails, prisons, hospitals, and juvenile beds are filled by "*perpetually interfering*" with cases, under the auspice of a failing "clearance rate" for each court.

109. Those judges who comply, Defendant Price politically supports them, those who oppose, Defendant Price executes a devasting political whisper campaign accusing judges of

[7] https://www.dallasnews.com/news/politics/2026/01/23/district-court-judge-sues-dallas-county-commissioner-john-wiley-price-for-defamation/.

producing a "failing clearance rate."[8] When in fact, many Dallas County judges refuse to be groomed by anyone, but they are soon removed from the bench.[9]

110. According to the Dallas Bar Association's judicial polls, Defendant Jackson has the lowest judicial competency record in the family court; however, Defendant Price endorses her because her "clearance rate" is high. This contradiction is due to Defendant Prices' access to her courts to fill jails, hospital beds, juvenile detention centers, and of course collect "probation fees."

111. Defendant Price prides himself on "going into court rooms" to influence judicial outcomes. In fact, he has bragged that he needed to support Defendant Jackson so that he can "go into her courtroom."

4. DEFENDANTS KNEW AND PLANNED TO USE RECUSALS AS A DELAY TACTIC TO DESTABILZE PLAINTIFFS' FAMILY UNIT IN ALL POST-JUDGEMENT RELIEF.

112. Defendants knew Dallas County Courts' recusal policy and practices would deny access to Plaintiff to the court for an enforcement hearing to have the Musgrove Children safely returned to Dallas County in compliance with Dallas Family Court 255th's order.

113. In fact, Defendants Andrade produced a fraudulent document which suborned perjury that the mother of knew and provided $5,000.00 to Defendant O'Neil when the mother of the Musgrove Children never met Defendant O'Neil prior to and immediately after Defendant O'Neil filed her initial appearance. The mother even admitted to having no record of payment

---

[8] https://www.keranews.org/government/2022-09-09/as-dallas-county-jail-population-grows-felony-judges-push-back-against-commissioners-criticisms.

[9] https://www.fox4news.com/news/courtcases-backlog-dallas-county-commissioners-at-odds-with-judges-over-disposition-rate

with Defendant O'Neil, and no record of transmission of the contract between the mother and Defendant O'Neil.

114. Defendants intentionally engaged in a conspiracy to retaliate against Plaintiffs for exercising their First Amendment rights by, *perpetually interfering* with other judges causing them to recuse themselves based on a "special relationship with Defendants."

115. To this very day, Defendant Jackson created and continues to create conflicts of interest within Plaintiffs' case in direct retaliation of Plaintiffs exercising their First Amendment rights to oppose Defendant Jackson politically.

116. Defendants, led by Defendant Jackson, created, and continues to create 'conflicts of interest' within Plaintiffs' legal proceedings to return his children based on the contemporaneous courts' "special relationship" with Defendant Jackson.

117. But for the political opposition and speech of Plaintiffs and Plaintiffs' families, Defendant Jackson would not have recused and *perpetually interfered* with the post-judgement relief to return the Musgrove Children to Dallas County.

118. As a direct and proximate cause of Defendant Price's ability to "go into Jackson's courtroom," Defendant Wiley learned and understood of *perpetual interference*s in Plaintiffs' case in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson.

119. As a direct and proximate cause of Defendants' *perpetual interference*s in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson, Plaintiff Musgrove and Plaintiff Musgrove Children have been alienated, destabilized, and separated as a family unit.

120. As a direct and proximate cause of Defendants' *perpetual interference*s in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson, Plaintiff

Musgrove and Plaintiff Musgrove Children have been denied their fundamental right to parentage, love, affection, and growth as a family unit.

121. Plaintiffs pray for immediate and permanent injunctive relief from any further retaliation against Plaintiffs for exercising their First Amendment Rights, for compensatory damages for violations of their First, Fifth, and Fourteenth Amendments rights, and punitive damages with attorney's fees pursuant to 42 U.S.C. §1988.

122. Defendants conspired and destabilized, separated, and alienated plaintiffs' family unit in retaliation of protected political speech.

123. Defendants' *perpetual interferences* denied plaintiffs access to the courts by fear of judicial retaliation.

124. Plaintiff's Family Lawyer stated to Defendant Price: Sandre Streete "doing the work" like other Dallas county family judge you endorse she too is continuing to use her bench to alienate black children from their fathers.

125. Defendant Price responded: "It's because of *perpetual interfere* that nobody is touching the case and the Administrative Judge is probably going to appoint a Republican from the hither lands. BTW, she lost."

### f. PLAINTIFFS AND THEIR FAMILIES ENGAGED IN PROTECTED SPEECH REGARDING SLAVERY DESTABILIZATION PRACTICES IN DALLAS FAMILY COURTS.

126. Dallas family court separation, destabilization, and alienation are entrenched slavery goals and legal practices traditionally inflicted upon people of color. The Dallas community is demanding accountability and answers.

127. Plaintiffs have been politically outspoken, even to Defendant Price regarding this abuse plaguing ALL families in the Dallas Fort-Worth area, and especially the minority

communities.

128. Plaintiffs' family exercised their political free speech to Defendant Price in stating, Sandre Streete is "doing the work" like other Dallas county family judge you endorse she too is continuing to use her bench to alienate black children from their fathers."

129. Defendant Price responded that Defendant Streete was not re-elected, and that no judge wanted to touch Plaintiffs' Custody Dispute and Bill of Review cases pending family court due to "*perpetual interference*."

130. Plaintiffs' political free speech is rooted in the antiquated slavery practices and policies plaguing the Dallas Family Courts. It was upon this political truth that Defendant Jackson began and continues to *perpetually interfere* in retaliation against Plaintiffs.

i. TEXAS SLAVERY FAMILY COURTS DESTABILIZE FAMILIES & COMMUNITIES.

131. Abusive court delay tactics and *perpetual interferences* cause permanent destabilization, separation, and alienation in family units. (Ex_1).

132. Slavery in America is not modern, it is ancient and the unusually brutal system of African Slavery explains the epidemic of absentee fathers in primarily minority communities. (Ex_1).

133. Slavery explains the cause of the welfare crises to destabilize minority families and cause ultimate dependence on the government (master). (Ex_1).

134. Slavery explains the higher crime rates in predominately democratic cities. This ensures a steady labor force and maintains political and economic power by restricting the right to vote, hold public positions, or even access to economic advantages; such as housing, business, mortgage, and even federal educational financing. (Ex_1).

135. Slavery explains the President Biden's immigration solution for "open boarders' policy" in effort to replace this slave labor class because slavery is both a White and Black issue.

136. White America calls it a "civil death," Blacks call it slavery. The rule of law (via the U.S. Supreme Court) calls it slavery. (Ex_1).

137. It is no longer just a Black American problem, it is devastatingly affecting White Americans, far worse by volume, but no one will listen. Hence, protestors stormed the capitol to demand accountability; but the Judicial Branch controls the regulations for those legally identified as slaves. (Ex_1). Peaceful lawsuits are the proper response.

138. While White Americans call it a "civil death," the extinguishing of civil rights, at its thought seed.

139. However, civil disabilities is a devise of slavery that originally targeted on people of color—now its devasting over one-third of America— and White America is learning the true effects of a slavery justice system in family courts by first destabilizing the family, then allowing the emotional, psychological, and spiritual torment to cause men, like Plaintiff, to stop paying child support and formally be convicted as a slave by the Texas family courts.

140. Slavery explains the destabilization crisis in family courts.

141. Slavery justice through the courts explains how and why Defendant Jackson's actions have been shielded from accountability. It is important that the color and gender of the judicial officer be considered irrelevant for purposes of this lawsuit.

142. Slavery justice explains Texas' unusually brutal child support enforcement policies and practices. Monies held and collected by the State of Texas oversee the management of Medicare, Medicaid, and welfare to ensure dependency on the government.

143. As eloquently explained in the Harvard Law and Policy review, the practice of state-sponsored family separation has deep roots in slavery. (Ex_1). Violently taking children from their parents for profit encapsulates the business of slavery and directly counters the rights inherent in reproductive justice, specifically, the right to raise our families with security, dignity, and respect. *Id.*

144. Over the course of 250 years, slavery led to the forceful separation of *millions* of Black people from their families. *Id.* The *Dred Scott* ruling would go on to inspire a civil war, as well as the Reconstruction Amendments, which, collectively, ended slavery except in cases of punishment for crime, made citizenship available to all people born or naturalized on U.S. soil, extended rights of due process to all who are subject to U.S. jurisdiction, and purported to remove race, color or previous condition of servitude as determining factors in assessing the right to vote. *Id.*

145. The purpose of these amendments was not just to create progressive policies to combat the effects of slavery, but also to abolish the systems that supported slavery. Unfortunately, the Thirteenth Amendment failed to ban slavery in cases of punishment for a crime. As a result, virtually all prison labor has been allowed to persist subject only to the Eighth Amendment's cruel and unusual punishment.

146. That glaring omission has led to the legal continuation of state-sponsored exploitation akin to slavery in jails and prisons throughout the nation. Not coincidentally, people of color, and especially Black people are overrepresented in jails and prisons in the United States. To the extent that jails and prisons continue slavery's legacy of family separation, families of color are disproportionately impacted by family separation as a result of incarceration. This is

true also for families entering at the U.S. southern border; families that are disproportionately families of color.

147. In the 1980s, the United States adopted a "tough on crime" stance that led to more arrests and a rapid increase in the jail and prison population. This stance helped spawn a mass incarceration effort beyond anything previously known despite having no correlative effect on reducing crime rates. As the use of prisons increased, so too increased the conflation of race and criminality. For example, the myth of the "welfare queen" and "crackbaby" gained prominence in the 1980s as issues implicating Black women's reproduction.

148. Placing a high burden on the state to avoid separation altogether and pursue separation only when necessary is a key component of the human right to family unity. As renowned expert Rachel Johnso-Farias, former Executive Director, Center on Reproductive Rights and Justice at Berkeley Law School opined, "the American right to family unity should incorporate this scheme."

149. As Chief Justice Roberts opined, finding that the punishment exception to the 13th Amendment was meant to be narrowly construed and was never meant to support a system of convict leasing or "wage servitude." Despite this, "the Thirteenth Amendment provided insufficient protection to Black citizens from being exploited, tortured, and killed in the system of bondage that replaced chattel slavery.

### ii. SLAVERY JUSTICE IS USED THROUGH AMERICAN COURTS TO DESTABLIZE AFRICAN AMERICAN FAMILIES.

150. The prohibition of 'slavery and involuntary servitude' in every form and degree, *except* as a sentence upon a conviction for crime, comprises much more than the abolition or prohibition of African slavery. *Slaughter-House Cases,* 83 U.S. 36, 49–50, 21 L. Ed. 394 (1872). Slavery in the annals of the world had been the ultimate solution of controversies between the

creditor and debtor; the conqueror and his captive; the father and his child; the state and an offender against its laws. *Id.*

151. The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary incidents. *C.R. Cases*, 109 U.S. 3, 22, (1883). Compulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities were the inseparable incidents of the institution of slavery *Id.* More extreme punishments for crimes were imposed on the slave than on free persons guilty of the same offenses. *C.R. Cases, 109 U.S*. 3, 22, (1883) (emphasis added).

152. The "incidents of slavery" described in *United States v. Stanley,* (the Civil Rights cases) were the legal "disabilities imposed upon slaves in different southern states." *United States v. Roof,* 225 F. Supp. 3d 438, 448 (D.S.C. 2016). Slavery in the United States was a "system made up of various component parts." *United States v. Roof*, 225 F. Supp. 3d 438, 448 (D.S.C. 2016); see also Darrell A.H. Miller, The Thirteenth Amendment, and the Regulation of Custom, 112 Colum. L. Rev. 1811, 1848 (2012) ("Slavery is not unitary; it is a bundle of disabilities, bound together by conventions.").

153. Those parts, collectively, are the badges and incidents of slavery, and "[o]f the two attributes of slavery identified as badges and incidents, the 'incidents' of slavery had a far more definite and accepted legal sense than the 'badges.'" *United States v. Roof,* 225 F. Supp. 3d 438, 448 (D.S.C. 2016); citing, George Rutherglen, <u>The Badges and Incidents of Slavery and the Power of Congress to Enforce the Thirteenth Amendment, in Promises of Liberty</u>: The History

and Contemporary Relevance of the Thirteenth Amendment 163, 164 (Alexander Tsesis ed. 2010).

154. After being duly convicted, a man or woman is legally considered a slave, subject to the disability laws that may prescribed upon him or her at any time.

155. Those civil disabilities maintain the political power, and President Trump, who was politically targeted, convicted, and sentenced as a legal slave, or "felon," is now fighting to avoid impending disabilities which unfairly enslave a man or woman to the soil.

156. In Dallas County the family courts are the pipeline to this slavery justice.

157. Plaintiffs are a black conservative republican, and their political views regarding the family court slavery justice system has forced them to comply at the threat, while enduring the destabilization of the family unit. This psychological terror was intended by the very words of known slave courts, and perfected by Defendant Jackson. In fact, during a proceeding before Defendant Jackson called and threatened the Dallas county sheriffs against one of Plaintiffs' local attorneys to intimidate and threaten the slavery justice system.

> If he can be said to have a *vicinage* at all, that vicinage as to him is within the walls of the penitentiary, which (if not literally and actually) yet in the eye of the law surround him wherever he may go, until he is lawfully discharged. If he has forfeited this right, which every freeman may claim, "a trial by a jury of his vicinage," that forfeiture is a consequence of his crime, and is one of the penalties which the law denounces against a convicted felon, as much one of the penalties attached to his crime, as the whipping post, the iron mask, the gag, or the dungeon, which is provided for offences other than felonies. ***He is for the time being a slave***, in a condition of penal servitude to the State, and is subject to such laws and regulations as the State may choose to prescribe.

*Ruffin v. Commonwealth*, 62 Va. 790, 798 (1871) (emphasis added).

158. *Ruffin* explained the felony criminal record which secretly sentences the poor unfortunate soul to over 44,000 disabilities, and many without time limits.

159. However, unpopular this truth may be, more White Americans, (by volume) have criminal records and thus more White Americans are subjected to these brutal slave-laws, amended to civil disability laws, than African Americans. Notwithstanding, Black Americans are *still* disproportionately affected based on their population.[10]

160. Of America's approximate 330 million men and women living between its boarder, 100 million (or nearly one-third) are directly impacted by theses never-ending debilitating civil disabilities. Another 100 million are indirectly affected because of the enormous burden placed on the family units.

161. This brutal slavery justice system is the source of Defendant Jackson's power of abuse used in family court proceedings.

162. By forcing Plaintiff to meet child support obligations while 'delaying until denied' communication and visitation with the children is a proven tactic by Defendant Jackson that caused and continues to cause men to stop paying child support and the pipeline into the slavery justice system.

163. Defendant Jackson brags of needing security because she has mastered the art of destabilizing and separating families. She finds contempt for the smallest infractions and holds fathers in contempt for not paying child support for children they cannot see.

164. On the weekends, the Dallas County Jail is filled with men from the Dallas County family courts who have been before Defendant Jackson, had their children

---

[10] *See e.g.,* 34 U.C. Davis L. Rev. 1005 (2000-2001) Criminal Justice and Black Families: The Collateral Damage of Over-enforcement.

stripped until they finally stopped paying child support, and abandoned the children.

165. Plaintiff and his family spoke politically against Defendant Jackson's *perpetual interferences* to cause delays which effectively denied Plaintiff, and Plaintiff Musgrove Children's First, Fifth, and Fourteenth Amendment rights.

166. Plaintiff Musgrove was ordered to pay nearly $3,3320.00 in child support, but denied access, and visitation of his children for political and gender reasons, which was the basis of the Defendant Jackson's conflict of interest.

167. In retaliation for Plaintiffs' family First Amendment Speech, Defendant Jackson personally and individually created, encouraged, and "perpetuated" a conflict then used her official office to cause delays by recusals throughout all of Dallas County family courts.

168. As of today, no Dallas County Court will hear Plaintiff's underlying family enforcement orders to hold the mother in contempt for failing to return the children to Dallas County, as direct and proximate cause of Defendants *perpetual interferences* through recusal policies and practices.

169. A private conflict between Dallas County district 302nd and Dallas County District 255th have effectively split the entire region as Defendants intended, and deprived Plaintiffs of their First, Fifth, and Fourteenth Amendment rights.

## COUNT ONE

**Pursuant to 42 U.S.C. §1983, 1985**
***Retaliation for Protected Speech in***
**VIOLATION OF THE FIRST AMENDMENT**

170. Plaintiff incorporates by reference, and repeated from the introduction and paragraphs 170 as though fully stated herein.

171. Plaintiffs, and their families, spoke out against Defendant Jackson during election season as protected speech for practicing antiquated slavery tactics in legal proceedings against ALL, based upon information and belief.

172. Plaintiffs, and their families, exercised protected political free speech in opposition to Defendant Jackson, in Plaintiffs' churches accusing judges, such as Defendant Jackson, of intentionally, willfully, and improperly destabilizing family units, and disproportionately targeting African American family units, based upon information and belief.

173. Plaintiffs, and their families, had a right to associate, and exercised protected political free speech in opposition to Defendant Jackson, in Plaintiffs' churches accusing judges, such as Defendant Jackson, of intentionally, willfully, and improperly destabilizing family units, and disproportionately targeting African American family units, based upon information and belief.

174. Defendant Jackson knowingly and intentionally went to the Plaintiffs' family church to create political conflict in retaliation against Plaintiffs' efforts to oppose Defendant Jacksons' re-election campaign, based upon information and belief.

175. Defendant Jackson, in her individual capacity, knew that Plaintiffs' family would be present at CW 2's church on November 9, 2025, based upon information and belief.

176. Defendant Jackson, defied the churches agreed campaign rules, went into the sanctuary, and in fact, created conflict with Plaintiffs' family exercising their freedom of protected speech against Defendant Jackson, based upon information and belief.

177. The following day, November 10, 2026, Defendant Jackson, in her official elected position as a judicial officer of the 302nd District, recused herself to intentionally delay and deny Plaintiffs access to the Courts in retaliation of Plaintiff' First Amendment rights, including the right to associate with family, CW 1 and CW 2's church, and Plaintiffs' religious beliefs, based upon information and belief.

178. Defendant Jackson knew and could reasonably foresee her recusal would cause a delay so psychologically, emotionally, and spiritually *painful* Plaintiff Brice Musgrove would stop, chill, and never exercise his protected speech, refuse to associate with his family or church and stop alerting the community of Defendant Jackson's slave tactics in court, based upon information and belief.

179. Defendant Jackson knew and could reasonably foresee her recusal would cause a delay which would deny Plaintiffs' rights to access the courts, based upon information and belief.

180. Defendant Jackson then conspired with Defendant Price to *perpetually* interfere with Plaintiff's Custody Dispute, and Bill of Review matters pending before other judges in the region, causing those judges to recuse themselves due to a relationship with Defendant Jackson, based upon information and belief.

181. Defendant Jackson *perpetually interfered* with numerous judges creating conflicts and voluntarily recusals in Plaintiffs' Bill of Review and Custody Dispute, in retaliation for protected speech on November 9, 2026, based upon information and belief.

182. Defendants knew, intentionally delayed proceedings in retaliation to cause Plaintiff Musgrove to give up hope fighting for his children, stop paying his child support, have a mental health breakdown and enforcement judgment by placing him in jail, using the slavery justice system.

183. Defendant Jackson has instituted this same pattern and practice to destabilize men from their families, until the men lose hope, and/or stop paying child support to ensure a steady supply of child support cases are cleared through jail.

184. But for, Defendant Jackson's retaliation, and escalated *perpetual interference* with the post-judgement relief to return the Musgrove Children to Dallas County, the Plaintiffs' motion to enforce would not have been delayed, and the Musgrove Children would be reunited in Dallas County today.

185. But for Defendants retaliation against Plaintiff Brice Musgrove, a black conservative republican, Plaintiffs would not have suffered denied access to the Love of their father.

186. But for Defendants political retaliation against Plaintiffs, and their family, Plaintiff Musgrove would not be denied access to perform, receive, and serve as a Loving father to the Musgrove Children.

187. As a direct and proximate cause of Defendants' *perpetual interference*s in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson, Plaintiff Musgrove and Plaintiff Musgrove Children have been alienated, destabilized, and separated as a family unit, based upon information and belief.

188. As a direct and proximate cause of Defendants' *perpetual interference*s, in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson, ***Plaintiffs are suffering severe mental, spiritual, and physical anguish***.

189. As a direct and proximate cause of Defendants' *perpetual interference*s in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson, Plaintiff Musgrove and Plaintiff Musgrove Children have been denied their fundamental right to parentage, love, affection, and growth as a family unit, based upon information and belief.

190. But for Defendants continuing *perpetual interference* with Plaintiffs custody and bill of review cases, Plaintiffs would be reunited in Dallas County today, under Dallas District Court 255th Order.

191. Plaintiffs pray for immediate and permanent injunctive relief from any further retaliation against Plaintiffs for exercising their First Amendment Rights, for compensatory damages for violations of their First, Fifth, and Fourteenth Amendments rights, and punitive damages with attorney's fees pursuant to 42 U.S.C. §1988.

## COUNT TWO
**Pursuant to 42 U.S.C. §1985**
***Conspiracy to violate Civil Rights through "Perpetual Interferences" in***

192. Plaintiff incorporates by reference and repeated from the introduction and paragraphs 192 as though fully stated herein.

193. Defendants Jackson and Price conspired to retaliate by *perpetually interfering* with Plaintiffs' Custody Dispute and Bill of Review cases pending before judges in the region, based upon information and belief.

194. Defendants Jackson and Price agreed to *perpetually interfere* with Plaintiffs' Custody Dispute and Bill of Review, to chill Plaintiffs' impact, effect, and support against Defendant Jackson, based upon information and belief.

195. Defendants Jackson and Price's "special relationship" was to allow Defendant Price in Defendant Jackson's courtroom, and in exchange, Defendant Price would provide notice of community politics and re-election support, based upon information and belief.

196. Defendants Adrade, and O'Neil conspired to enter Plaintiffs' Custody Dispute and Bill of Review to force Hon. Judge Bailey to recuse herself, in furtherance of their agreement to *perpetually interfere* with Plaintiffs' First and Fifth Amendment Rights, based upon information and belief.

197. Defendants Andrade and O'Neil produced a contract with a false signature claiming mother of Musgrove Children retained Defendant O'Neil. In fact, the Musgrove Children's mother never spoke and never formally met prior to Defendant O'Neil entry of appearance.

198. Defendant O'Neil only appeared in the Custody Dispute, and Bill of Review to cause delays and *perpetually interfere* with the safe return of the Musgrove Children using Hon. Judge Bailey's standing recusal order against Defendant O'Neil.

199. Defendant Price's ongoing feud with Hon. Judge Bailey, after Hon. Judge Bailey refused his advances, caused and prompted Defendants Price to assist and agree in locating and requesting Defendant O'Neil to file appearances in further effort to *perpetually interfere*, based upon information and belief.

200. Defendants agreed, conspired, and discussed continuance of their efforts to *perpetually interfere* when Hon. Judge Bailey recused herself due to her relationship with Defendant O'Neil, based upon information and belief.

201. Defendants agreed, conspired, and discussed continuance of their efforts to *perpetually interfere* when Defendant Streete recused herself due to her relationship with Defendant Jackson, based upon information and belief.

202. Defendants agreed, conspired, and discussed continuance of their efforts to *perpetually interfere* when Hon. Judge Ledeitra Adkins recused herself due to her relationship with Defendant Jackson, based upon information and belief.

203. Defendants agreed, conspired, and discussed continuance of their efforts to *perpetually interfere* when Hon. Judge Kim Brown recused herself due to her relationship with Defendant Jackson, based upon information and belief.

204. Defendants agreed, conspired, and discussed continuance of their efforts to *perpetually interfere* when Hon. Judge Ashley Wysocki recused herself due to her relationship with Defendant Jackson and O'Neil, based upon information and belief.

205. Defendants agreed, conspired, and discussed continuance of their efforts to *perpetually interfere* when Hon. Judge Ray Wheeless recused himself due to his relationship with all Defendants, based in information and belief.

206. But for the political opposition and speech of Plaintiffs and Plaintiffs' families, Defendant Jackson would not have recused and *perpetually interfered* with the post-judgement relief to return the Musgrove Children to Dallas County.

207. But for Defendants political retaliation against Plaintiffs, and their family, Plaintiff Musgrove would not be denied access to perform, receive, and serve as a Loving father to the Musgrove Children.

208. But for Defendants conspiracy and agreement to retaliate against Plaintiffs for engaging in politically protected speech, Plaintiffs would not be denied the right, access, to love and affection from parent to child, also guaranteed under the Fifth and Fourteenth Amendment.

209. As a direct and proximate cause of Defendants' conspiracy to *perpetually interfere* in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson, Plaintiff Musgrove and Plaintiff Musgrove Children have been alienated, destabilized, and separated as a family unit, based upon information and belief.

210. As a direct and proximate cause of Defendants' conspiracy to *perpetually interfere* in retaliation of Plaintiff exercising his First Amendment rights against Defendant Jackson, Plaintiff Musgrove and Plaintiff Musgrove Children have been denied their fundamental right to parentage, love, affection, and growth as a family unit, based upon information and belief.

211. As a direct and proximate cause of Defendants' conspiracy to perpetually interfere in retaliation of Plaintiffs exercising their First Amendment rights against Defendant Jackson, Plaintiff Musgrove and the Plaintiff Musgrove Children ***are suffering severe mental, spiritual, and physical anguish.***

212. But for Defendants continuing *perpetual interference* with Plaintiffs custody and bill of review cases, Plaintiffs would be reunited in Dallas County today, under Dallas District Court 255th Order.

213. Plaintiffs pray for immediate and permanent injunctive relief from any further retaliation against Plaintiffs for exercising their First Amendment Rights, for compensatory damages for violations of their First, Fifth, and Fourteenth Amendments rights, and punitive damages with attorney's fees and costs pursuant to 42 U.S.C. §1988.

## COUNT THREE

## VIOLATION OF THE FIFTH AMENDMENT
**Substantive and Procedural Due Process Clause(s)**
**Pursuant to 42 U.S.C. §1983**

214. Plaintiff incorporates by reference and repeated from the introduction and paragraphs 214 as though fully stated herein.

215. Defendants *perpetually interfered* intentionally to oppress and suppress Plaintiffs' First Amendment Rights to speak out for his right to be father, give care, love, and affection pursuant to the Fifth and Fourteenth Amendment.

216. Defendants did not have any legitimate state interest or safety issues in *perpetually interfering* with Plaintiffs' Custody Dispute or Bill of Review.

217. Defendants conduct shocked the conscience because Defendants acted with the purpose, intent, and desire to destabilize the Plaintiffs' family unit relying on and embracing slavery tactics of destabilization.

218. Defendant Jackson intentionally retaliated against Plaintiffs for political speech to destabilize, separate, and alienate, through unreasonable delays, the enforcement of returning the Musgrove Children to the DFW.

219. Defendant Jackson, in agreement with Defendants Price and Streete intended to cause such a delay as to inflict psychological, emotion, and spiritual pain on Plaintiffs' by *perpetually interfering* with Plaintiffs' Custody Dispute and Bill of Review matters.

220. Defendants acted with deliberate indifference to the Plaintiff Musgrove Children in separating them from a loving father, who had been rearing them their entire lives.

221. Plaintiff Brice Musgrove always, and forever, established his fundamental right to raise, enjoy, care and protect the Musgrove Children.

222. Defendants know and should have known of the danger of causing such a delay as to prevent the Plaintiff Musgrove Children from returning to a stable family unit, as destabilization of the African American communities is the number one cause injury to its communities.

223. But for Defendants political retaliation against Plaintiffs, and their family, Plaintiff Musgrove would not be denied access to perform, receive, and serve as a Loving father to the Musgrove Children.

224. But for Defendants conspiracy and agreement to retaliate against Plaintiffs for engaging in politically protected speech, Plaintiffs would not be denied the right, access, to love and affection from parent to child, also guaranteed under the Fifth and Fourteenth Amendment.

225. As a direct and proximate cause of Defendants' conspiracy to *perpetually interfere* in retaliation of Plaintiff exercising his Fifth and Fourteenth Amendment rights against Plaintiff Musgrove and Plaintiff Musgrove Children have been alienated, destabilized, and separated as a family unit, based upon information and belief.

226. As a direct and proximate cause of Defendants' conspiracy to *perpetually interfere* in retaliation of Plaintiff exercising his Fifth and Fourteenth Amendment rights against Plaintiff Musgrove and Plaintiff Musgrove Children have been denied their fundamental right to parentage, love, affection, and growth as a family unit, based upon information and belief.

227. But for Defendants continuing *perpetual interference* with Plaintiffs custody and bill of review cases, Plaintiffs would be reunited in Dallas County today, under Dallas District Court 255th Order.

228. Plaintiffs pray for immediate and permanent injunctive relief from any further retaliation against Plaintiffs for exercising their First Amendment Rights, the Fifth Amendment Rights, and Fourteenth Amendments and for compensatory damages for violations of their First, Fifth, and Fourteenth Amendments rights, and punitive damages with attorney's fees and costs pursuant to 42 U.S.C. §1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

1. Enjoin Defendants from any further "*perpetual interference*" in the *Child Custody* or *Bill of Review* Matters, in retaliation of Plaintiffs' First Amendment Rights.
2. Compensatory and Punitive Damages.
3. Attorney's fees and costs pursuant to 42 USC § 1988.
4. Any other relief this Court deems just.

Submitted:

September 10, 2026

/s/ Daniel A. Dailey

Daniel A. Dailey
*Chief Federal Litigation Counsel*

KINGDOM LITIGATORS
INTERNATIONAL LTD.

500 N Michigan Ste. 536
Chicago, IL 60611
(312)999-8331
ddailey@kglit.com
*Admitted in NDTX*
ARDC #6312616